**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CHRISTOPHER CHAVEZ,

     Plaintiff,

v.                                                                                  Civ. No. 1:20-cv-00812 MIS/LF

ABEL RENTERIA; JOHN DOE 1;
CHRISTOPHER TURNBOW;[1] CARLOS SAENZ;
DANIEL BLANCO, in his individual capacity;
ESTEVAN FLORES, in his official capacity; and
NEW MEXICO CORRECTIONS DEPARTMENT,

     Defendants.

**MEMORANDUM OPINION AND ORDER
ON DEFENDANT NEW MEXICO CORRECTIONS DEPARTMENT'S
MOTION FOR SUMMARY JUDGMENT (ECF NO. 81)**

     THIS MATTER is before the Court on Defendant New Mexico Corrections
Department's Motion for Summary Judgment. ECF No. 81. Plaintiff filed his Response,
and Defendant NMCD filed its Reply. ECF Nos. 97, 123. The Court ordered additional
briefing regarding whether NMCD is an arm of the state that cannot be sued under 42
U.S.C. § 1983, and if so, whether amendment of the Complaint would be futile. ECF No.
143. The parties presented briefing on this issue. ECF Nos. 144, 145.

     Having considered the parties' submissions, the most recently amended
complaint,[2] the record, and the relevant law, the Court will dismiss Count II of the First

---

[1] Defendant Turnbow is listed as "Christopher Turbow" in the First Amended Complaint. ECF No.
30. The person that filed a waiver of the service of summons is "Christopher Turnbow," however. ECF No.
40. The Court will refer to this Defendant as "Christopher Turnbow." The parties are advised to file the
appropriate documents to address this discrepancy, if necessary.

[2] For reasons stated herein, Court will dismiss Count II of the First Amended Complaint as to
NMCD. *See* Legal Standards, § 2 *infra*; Discussion, § 1 *infra*. Therefore, the Court analyzes the most

Amended Complaint, find the Motion moot as to Count II, and deny the remainder of the Motion.

## PROCEDURAL BACKGROUND

This is a case brought by Plaintiff, Christopher Chavez ("Plaintiff"), a former inmate housed at the Southern New Mexico Correctional Facility ("Southern"), against Defendant New Mexico Corrections Department ("NMCD") and several of its employees.

Pertinent to the present Motion, Plaintiff alleges that Defendant NMCD committed violations of the Eighth and Fourteenth Amendments to the United States Constitution compensable under 42 U.S.C. § 1983 (Count II), as well as torts within the New Mexico Tort Claims Act's waiver of immunity for premises liability,[3] N.M. Stat. Ann. § 41-4-6 (1978) (Count IV).[4] *See* ECF No. 30, ¶¶ 93–100, 108–115. Specifically, Plaintiff alleges that Defendant NMCD had an unconstitutional policy, practice, or custom of deliberate indifference to inmate safety (in this case, a substantial risk of Plaintiff being harmed by being housed with members of a dangerous prison gang known as the "Burqueños") and that, as a result, a member of the Burqueños gang threw a cup of boiling water in Plaintiff's face, resulting in severe injury to Plaintiff. Plaintiff also alleges that under the

---

recently amended complaint. *See* Fed. R. Civ. P. 12(b)(6), 12(c). Regardless of whether dismissal under Rule 12(b)(6) or judgment on the pleadings under Rule 12(c) is most appropriate, both are treated as a motion to dismiss under Rule 12(b)(6). *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).

[3] The Court uses the term "premises liability" for ease of reference only. The statute itself, § 41-4-6 NMSA 1978, waives immunity for negligent "operation or maintenance of any building, public park, machinery, equipment or furnishings."

[4] The remaining claims, which are listed under Count I and Count III of the First Amended Complaint, do not apply to Defendant NMCD. *See* ECF No. 30 at 14, 18.

New Mexico Tort Claims Act's ("NMTCA") waiver of immunity for premises liability, Defendant NMCD negligently created conditions at SNMCF that allowed Plaintiff to be housed with members of the Burqueños gang, resulting in the injury he sustained.

The present Motion, ECF No. 81, seeks summary judgment on all claims brought by Plaintiff against Defendant NMCD. Specifically, Defendant NMCD argues that there is insufficient evidence to establish municipal liability on the basis of an unconstitutional policy, practice, or custom. Defendant NMCD also argues that the NMTCA waiver of immunity for premises liability does not apply to the facts of this case, and that, therefore, governmental immunity has not been waived for injuries allegedly caused by its employees while acting within the scope of their duties.

In response to the Motion, Plaintiff argues that there is sufficient evidence showing that Defendant NMCD had unconstitutional policy, practice, or custom of deliberate indifference to inmate safety for purposes of 42 U.S.C. § 1983. Further, Plaintiff argues that New Mexico's premises liability waiver, N.M. Stat. Ann. § 41-4-6 (1978), applies because Defendant NMCD had a negligent policy, practice, or custom that created a risk of harm to inmates at SNMCF, including Plaintiff.

In order to give the parties notice and a reasonable time to respond, *see* Fed. R. Civ. P. 56(f)(2), the Court also ordered additional briefing on the issues of (1) whether NMCD is subject to dismissal or summary judgment as an arm of the State of New Mexico for purposes of 42 U.S.C. § 1983, and (2) whether amendment of the Complaint would be futile. ECF No. 143. In response, Defendant NMCD argued that it was not subject to suit pursuant to 42 U.S.C. § 1983. ECF No. 144 at 1–3. Likewise, although asserting that a colorable argument could be made that NMCD "is actually not an 'arm

of the state,'" Plaintiff conceded that the "current state of the law" supports dismissal of his claim against NMCD under § 1983. ECF No. 145 at 1–3.

To the extent applicable, the Court will address each of Defendant NMCD's relevant arguments, and Plaintiffs' relevant responses thereto, in turn.

## FACTUAL BACKGROUND[5]

The facts stated below are either undisputed or stated in the light most favorable to the nonmovant, for purposes of the present Motion:[6]

### I.   Overview

Plaintiff has spent much of the last two decades incarcerated in the custody of Defendant NMCD. *See* ECF No. 84-6 at 1–2. Defendant NMCD is the cabinet-level agency of the State of New Mexico that, during the applicable time period, employed the other named Defendants in this litigation, all supervisory-level employees. *See* ECF No. 81, UMF 1; ECF No. 97-3 at 2; ECF No. 97, UMF U; ECF No. ECF No. 97, UMF Q; ECF No. 80-2 at 1.[7]

While an inmate at various NMCD facilities, Plaintiff claimed on multiple occasions that he was at risk of violence from members of the Los Padillas and Burqueños gangs, due to past physical altercations with, and threats from, members of these gangs. *See* ECF No. 97-7 at 1–6, 8–15; ECF Nos. 97-9, 97-12, 97-13; ECF No.

---

[5] Because Count II will be dismissed, the Court includes only the facts that are pertinent to Plaintiff's claims brought in Count IV of the Amended Complaint, as well as additional background facts, as necessary.

[6] For purposes of the Motion for Summary Judgment, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See* Standard for Summary Judgment section.

[7] *See also* Office of the Governor Home Page, https://www.governor.state.nm.us/our-leadership/ (last visited Sept. 8, 2022).

97-15 at 1–4; ECF No. 97-16 at 1–2; ECF No. 97-17 at 1–2. Since at least 2011, Plaintiff has experienced gang-related violence from, or physical altercations with, members of these gangs, including violent assaults on Plaintiff in 2011 and 2017. ECF No. 97-11 at 9; ECF No. 97-12; ECF No.97-15 at 1–4; ECF No. 97-16 at 1–2. Also, in 2013, Plaintiff was placed in involuntary inmate protection due to information from confidential sources that younger members of the Burqueños gang had placed a "hit" on him, thus making him a target for future violence. *See* ECF No. 97, UMF BB(v). The above-mentioned safety concerns were clearly noted in Plaintiff's inmate file and were known to various officials within NMCD. *See generally id.*, UMF BB. As of 2019 (the year of the injury claimed in this lawsuit), at least one notation in Plaintiff's inmate file reflected that this safety concern (i.e., the risk of violence from Los Padillas and Burqueños gang members) was unresolved. *See id.*, UMF FF.

Within the NMCD system, prison gangs pose a significant threat to inmate health and safety, due to their illicit activities such as drug trafficking, extortion, and violence. *See, e.g.*, ECF No. 97-3 at 10–11 (referring specifically to the Burqueños gang). Gangs such as the Burqueños exert power and control over the prison population through the use of intimidatory tactics and violence. *Id.* In turn, inmate-on-inmate violence creates a threat to the overall safety and security of prison facilities. ECF No. 97, UMF I. NMCD has classified the Burqueños gang as a "disruptive threat group" ("DTG"), which is a group involved in criminal activities within the prison facility. *See* ECF No. 97-3 at 10–11. The Burqueños gang is the largest DTG within the NMCD system. ECF No. 97-3 at 10. NMCD has a policy encouraging inmates affiliated with DTGs to "dissociate" from, or renounce their affiliation with, these groups. ECF No. 97-5 at 6. Dissociation from a

DTG endangers the safety of an inmate, putting the inmate at risk of violent attacks by members of DTGs. ECF No. 97, UMF L; ECF No. 97-2 at 3; ECF No. 97-5 at 7–8.

During his incarceration, Plaintiff was affiliated with the Burqueños gang. ECF No. 97-11 at 4. Plaintiff had sought to dissociate from the Burqueños gang "many times" in the years preceding his injury, including a request in 2017 after Plaintiff was involved in a fight with another inmate. *See* ECF No 97-11 at 4; ECF No. 97-16 at 1–2; ECF No. 126-6 at 2. Plaintiff's concerns regarding the Burqueños gang, as well as another prison gang called Los Padillas, were well documented in the Corrections Management Information System ("CMIS"), an electronic database of prisoner records. *See* ECF No. 97-7 at 1–6, 8–15.

Prior to being transferred to Southern, where Plaintiff's injury occurred, Plaintiff was in the custody of NMCD at the Regional Diagnostic Facility, which is part of the Central New Mexico Correctional Facility. ECF No. 82-4 at 1–2. On July 23, 2019, he was transferred to Southern. *Id.* After his transfer to Southern, he was placed into housing Pod 4B, which was part of a "Level IV" housing unit consisting of inmates who were monitored more closely and were considered a higher threat level than other inmates. ECF No. 97-3 at 4, 6. Immediately after being transferred, he spent approximately seven days in "orientation" and was confined to his cell, leaving only to shower, utilize the phone, and attend to basic necessities. ECF No. 97, UMF Y(v); *see also* ECF No. 96-7 at 15–16 (during orientation inmates leave their cells only when the rest of the inmates are locked down and secured).

During the time period relevant to this lawsuit, NMCD housed influential leaders of the Burqueños gang. ECF No. 97-4 at 6. One of these influential leaders was inmate

Michael Padilla. *Id.* at 7. Several of NMCD's employees, including the named Defendants, either knew or suspected that inmate Padilla or other members of the Burqueños gang were a risk to the security and safety of inmates at the facility. *See* ECF No. 97-4 at 7 (Defendant Blanco suspected inmate Padilla of carrying out hits on other inmates); ECF No. 96-2 at 6 (Plaintiff told Defendant Renteria that inmate Padilla was "going to get him" by using other inmates to commit acts of violence); ECF No. 97-1 at 3 (Defendant Turnbow was aware that, for the past few years, the Burqueños were a DTG that would "plan stuff as a group"). It was within the scope of these employees' duties to ensure that gang violence against inmates did not occur. *See* ECF No. 97, UMF Q (as to Defendant Blanco); ECF No. 97, UMFs U, V (as to Defendant Turnbow). ECF No. 97, UMF T (as to Defendant Renteria).[8] Also, at least two of these employees knew that Burqueños members could communicate with each other using kites (i.e., secret written communications) and sign language, even if they did not live in the same unit. *See* ECF No. 97, UMF S.

## II. Defendant Christopher Turnbow

Defendant Turnbow was the housing captain who reviewed Plaintiff's inmate file and placed him into Pod 4B. ECF No. 97, UMF Z. In this role, Defendant Turnbow had decision-making authority over housing assignments of incoming inmates including Plaintiff. *Id.* As previously stated, it was within the scope of Defendant Turnbow's duties to ensure that gang violence against inmates did not occur. *See* ECF No. 97, UMF V. Specifically, one of Defendant Turnbow's responsibilities was to ensure that housing

---

[8] Defendant NMCD contested Plaintiff's UMF T only on the basis of the involvement of Defendants Blanco (STIU Coordinator) and Turnbow (Housing Captain). Therefore, the Court assumes that UMF T is uncontested as to Defendant Renteria (Unit Manager).

assignments did not endanger inmates from potential physical assaults or other disturbances between inmates, including ensuring that inmates were not housed with listed enemies. *See id.* Defendant Turnbow was aware that an assault may result from housing an inmate with enemies. ECF No. 97-1 at 4. Although other prison administrators had the power to review inmate housing assignments and make adjustments as necessary, in general, Defendant Turnbow had the final say in making housing assignments for inmates within his control.[9] ECF No. 97-1 at 6.

As part of his practice for each incoming inmate under his control, Defendant Turnbow would pull up the inmate's file in the Corrections Management Information System ("CMIS"), verify the inmate's custody level, and look at the inmate's CBC Summary Review Report,[10] which contains an inmate's conviction history, misconduct reports, known enemies, gang affiliations, administrative segregation history, and medical/mental health summary, among other information. *See* ECF No. 97-1 at 4; ECF No. 84-6 at 1–2. Notably, the CBC Summary Review Report does *not* contain an inmate's detailed safety concerns, which must be viewed on a separate screen. *See* ECF No. 97-1 at 4. Although Defendant Turnbow would look at the CBC Summary Review Report as a matter of course prior to making an inmate housing assignment, he would not necessarily look at other CMIS screens, such as an inmate's detailed safety concerns, unless "something prompted" him to do so. *See* ECF No. 98-1 at 4. According to Defendant Turnbow, some things that would prompt him to look at an inmate's

---

[9] The Court notes that it has found nothing in the record to suggest that a higher-level prison administrator made adjustments to Plaintiff's housing assignment after Defendant Turnbow assigned Plaintiff to Pod 4B.

[10] The parties have not defined "CBC Summary Review Report," but it appears to be a computer printout taken from the CMIS database.

detailed safety concerns would be if the inmate had "a lot of fights" or "something . . . on their history" that warranted further review. *See* ECF no. 97-1 at 4–5. After reviewing the inmate's file, Defendant Turnbow would then assign the inmate to a cell based on custody level, known enemies, and number of beds. ECF No. 97, UMF xii.

Defendant Turnbow admits that he reviewed Plaintiff's CBC Summary Review Report; however, he does not recall reviewing Plaintiff's detailed safety concerns, which were listed on a separate screen. *See* ECF No. 97-1 at 9; ECF No. 84-6 at 1–2 (CBC Summary Review Report); ECF No. 97-7 at 1–6, 8–15 (detailed safety concerns). Plaintiff's CBC Summary Review Report listed (in relevant part) the following:

New Mexico
Corrections Department
CBC Summary Review Report
.   .   .
Name: CHAVEZ, CHRISTOPHER CANDEL
.   .   .
Misconduct Reports
.   .   .
09/09/2017-FIGHTING(MAJOR);  . . .  08/01/2016-STRIKES OR THREATENS TO STRIKE A STAFF M(MAJOR); . . . 08/08/2016-THREATENING ANOTHER PERSON OR COMMUNICAT(MAJOR);  . . .  12/27/2012-FIGHTING OR HORSEPLAY(MAJOR);  . . .  12/16/2008-THREATENING ANOTHER PERSON OR COMMUNICAT(MAJOR); 09/12/2008-VERBAL ABUSE OR GESTURES(MINOR); . . . 11/08/2004-FIGHTING OR HORSEPLAY(MINOR);  . . . 03/09/2000 USE ABUSIVE WORDS/GESTURES TO PROVOKE FI(MAJOR)
.   .   .
Enemies
.   .   .
MICHAEL PADILLA-56545 SNMCF MAIN;
.   .   .
STG[11]

---

[11] In the context of the CBC Summary Review Report, "STG" stands for the "Security Threat Group" section and includes suspected gang affiliations. *See, e.g.*, ECF No. 98, UMF b; ECF No. 98-6 at 1.

> OLD TOWN - ABQ-SUSPECTED; BURQUENOS-SUSPECTED
> <u>Administrative Segregation Time</u>
>
> .   .   .
>
> Start 05/22/2009 i/m identified as leader of street gang burque boys; Start 05/15/2013 INMATE PROTECTION
>
> .   .   .

ECF No. 84-6 at 1. As shown above, the report reviewed by Defendant Turnbow listed eight incidents of fighting, verbal abuse, or threats; one known enemy at Southern; suspected affiliation with two gangs; and administrative segregation for being "identified as leader of street gang [B]urque [B]oys" and "inmate protection." *Id.* Padilla was the only named person at SNMCF that was listed on Plaintiff's enemies list in CMIS. ECF No. 84-6 at 1. However, in a separate list of safety concerns, also in CMIS, Plaintiff had claimed all members of the Burqueños gang as enemies. ECF No. 97-7 at 2. The inmate's detailed safety concerns include additional information concerning the inmate's claimed enemies, gang-related issues, and other information meant to prevent assaults from occurring in the future. *See* ECF No. 97, UMF W(vi). As already stated, Defendant Turnbow denies reviewing Plaintiff's detailed safety concerns, but standard practice would have been to do so only if something prompted him. *See* ECF no. 97-1 at 4–5.

### III.   Defendant Abel Renteria

During the time period relevant to this lawsuit, including the period of Plaintiff's orientation and thereafter, Defendant Renteria was the unit manager for housing Pod 4B, where Plaintiff was assigned. ECF No. 97, UMFs Y(iii), Z. As a unit manager, he oversaw daily operations within the housing unit. ECF No. 97-3 at 2. It was his responsibility to monitor the inmates in his unit and to ensure that each inmate would

get along with other inmates in that unit. *See* ECF No. 96-7 at 4; ECF No. 97-8 at 2. He

was aware that inmates were at risk of serious harm if not kept at a distance from listed

enemies. ECF No. 96-7 at 8.

On Plaintiff's last day of orientation, July 31, 2019, he met with SNMCF's

Transitional Accountability Plan ("TAP") Committee to discuss his transition to living in

Pod 4B. ECF No. 97-3 at 2–4. Defendant Renteria was the chair of the TAP Committee.

*Id.* The TAP Committee covered multiple aspects of introducing inmates to the facility,

including enemy lists. ECF No. 97, UMF Y(vii). As part of the TAP Committee process,

Defendant Renteria would look at the inmate's information in CMIS. ECF No. 96-7 at

3.[12] This included the inmate's gang affiliation, enemies, and disciplinary history, among

other information. *Id.*; *see also* ECF No. 97, UMF Y(xi). Upon review of the inmate's

information, if the inmate "voice[d] his concern for his safety," the TAP Committee had

the ability to move the inmate to a different type of housing unit. ECF No. 96-7 at 4.

Notably, the TAP Committee relied "mostly on the inmate" to indicate whether "he feels

he's safe or at risk or not." ECF No. 96-7 at 3–4. However, if there were "other

---

[12] The Court is mindful of a difference between Plaintiff's allegations made in his Response to Defendant Renteria's Motion for Summary Judgment (ECF No. 96) versus Plaintiff's allegations made in response to the present Motion (ECF No. 97). Specifically, In Plaintiff's Response to Defendant Renteria's Motion for Summary Judgment, ECF No. 96 at 9, Plaintiff alleges that Defendant Renteria reviewed Plaintiff's specific safety concerns, which clearly would have shown that he was at risk of violence from the Los Burqueños gang. On the other hand, in his Response to the present Motion, ECF No. 97 at 9–10, Plaintiff does not allege that Defendant Renteria reviewed his specific safety concerns, and instead Plaintiff claims that "Defendants did not routinely review the Inmate Safety Concerns" as a matter of NMCD practice, policy or custom. *See* ECF No. 97 at 28. The Court does not know whether the finder of fact will find that Defendant Renteria actually looked at the safety concerns and deliberately disregarded them (in violation of Plaintiff's rights under Section 1983) or whether, pursuant to an NMCD policy, practice, or custom, he did not look at the file (in violation of Plaintiff's rights under New Mexico tort law); of course, it is also possible that the finder of fact will find neither of these violations occurred. For purposes of the present motion, the Court views the evidence in the light most favorable to the Plaintiff as the nonmovant. Given that there is sufficient evidence that Defendant Renteria failed to review Plaintiff's detailed safety concerns pursuant to an NMCD practice, policy or custom, this issue (even if material) would not affect the outcome of the present Motion.

concerns," such as being a sex offender, the TAP Committee could reassign the inmate regardless of whether he voiced his concern. *Id.*

As a regular part of a committee meeting, it was Defendant Renteria's practice to review an inmate's CMIS information, including the inmate's disciplinary history, charges, gang affiliation, enemies, and behavioral concerns. ECF No. 97-3 at 3. In Plaintiff's case, this included eight incidents of fighting, verbal abuse, or threats; one known enemy at Southern; suspected affiliation with two gangs; and administrative segregation for being "identified as leader of street gang [B]urque [B]oys" and "inmate protection."[13] ECF No. 125-6 at 1. During Plaintiff's committee meeting on July 31, 2019, he met with Defendant Renteria and went through his listed enemies. ECF No. 97-11 at 2; ECF No. 97-3 at 2–4, 10. After noting the listed enemies, Defendant Renteria explained that a listed enemy, inmate Michael Padilla, was in the compound but that Plaintiff would not have any physical interaction with Padilla. ECF No. 97-3 at 10.[14] Plaintiff had the opportunity to advise defendant Renteria of his safety concerns, and at that time, Plaintiff stated that Padilla was "going to get" him. *Id.*; ECF No. 97-11 at 3. During the meeting, Plaintiff called Padilla a "big ole' weenie" because Padilla sends other inmates to "do his business," i.e., to carry out orders of violence. ECF No. 97-3 at 10; ECF No. 96-2 at 6. Defendant Renteria was familiar with Padilla, including

---

[13] The "CMIS information" referred to above is contained in Plaintiff's CBC Summary Review Report. *See* ECF No. 125-6. The Court finds that, when the evidence is viewed in the light most favorable to Plaintiff, Defendant Renteria admitted reviewing this report in CMIS. *See* ECF No. 97-3 at 3 (describing the types of CMIS information Defendant Renteria reviewed, which are consistent with the information contained in the CBC Summary Review Report).

[14] Defendant Renteria had responsibility over both Pod 4B (where Plaintiff and Garcia were housed) as well as Pod 4A (where Padilla was housed). ECF No. 96-7 at 6, 12. He also knew that Michael Padilla was on Plaintiff's enemy list. ECF No. 82-5 at 3.

his affiliation with the Burqueños gang, in particular a leader whom the younger inmates looked up to. ECF No. 96-7 at 11–13. Although Plaintiff and Padilla were in separate housing units, they could see each other while outside for recreation. ECF No. 96-2 at 2, 6. Defendant Renteria was aware that inmates from Pod 4A and 4B could see each other. *Id.* Defendant Renteria was also aware that members of the Burqueños gang could communicate between different pods by hand sign and kites. ECF No. 96-7 at 10, 14.

Padilla was the only named person at SNMCF that was listed on Plaintiff's enemies list in CMIS. ECF No. 84-6 at 1. However, in a separate list of safety concerns, also in CMIS, Plaintiff had claimed all members of the Burqueños gang as enemies. ECF No. 97-7 at 2. During the TAP Committee meeting, Defendant Renteria did not review Plaintiff's detailed safety concerns in CMIS because NMCD policy, practice, or custom did not require him to do so. *See* n.13 *supra*; *see also* ECF No. 96-7 at 4. However, had he done so, he would have seen that Plaintiff's first listed safety concern reads as follows:

> CLAIMING ALL LOS PADILLAS & BURQUENOS GANG MEMBERS AS ENEMIES DUE TO THE PROBLEMS WITH LOS PADILLAS GANG MEMBERS AT [various facilities] GCCF, LCCF & NENMDF, PNM SOUTH. INMATE CLAIMS TO HAD TO FIGHT OR HAS BEEN ASSAULTED BY MEMBERS OF BOTH GANGS AT THOSE FACILITIES DUE TO PROBLEM.

ECF No. 97-7 at 2.

In early August 2019, several inmates told Plaintiff that Padilla did not want him in housing Pod 4B, and that he "better go" (i.e., leave housing Pod 4B) because Padilla, through the use of kites, told them that he did not want Plaintiff residing in that housing

unit. ECF No. 97-11 at 2–3. Sometime between August 1 and August 4, 2019, shortly after seeing Padilla in the yard at Southern, Plaintiff mailed a letter to Defendant Renteria, expressing that he felt unsafe from Padilla. ECF No. 97, UMF HH; ECF No. 97-11 at 3.[15] There is no indication in the record that Defendant Renteria acted on Plaintiff's concerns expressed in the August 2019 letter, or on the concerns Plaintiff expressed about Padilla during the TAP Committee meeting on July 31, 2019.

### IV.   Defendant Daniel Blanco

Defendant Blanco has been the Security Threat Intelligence Unit ("STIU") coordinator for Southern since February 2015. See ECF No. 80-2 at 1. He supervises a staff of seven STIU officers, who work in gathering intelligence or information related to security threats. Id. As the STIU coordinator, he is involved in reviewing inmate files and STIU information[16] to make housing recommendations for the safety of inmates. ECF No. 97-4 at 2–5. Part of Defendant Blanco's role as STIU coordinator is to gather intelligence in order to curb gang activities before they happen. ECF No. 99-1 at 2. This includes tracking and monitoring suspected members of DTGs, including the

---

[15] Plaintiff states that at least a day before his injury, he mailed the letter to Defendant Renteria, expressing that he felt unsafe from Padilla. ECF No. 97-11 at 3. Defendant Renteria disputes that the letter was mailed or received. ECF No. 82 at 4. It is unclear whether Defendant Renteria could have received the letter prior to Plaintiff's injury. For purposes of the present Motion, this dispute is immaterial.

[16] Based on the documents submitted by the parties, the "inmate files" referred to by Plaintiff consist of information in a computer database called "CMIS," to which multiple personnel in the prison system have access. See, e.g., ECF No. 99-1 at 3 (describing CMIS and the types of information it contains, including whether an individual has enemies); id. at 4–5 (CMIS information contains suspected DTG affiliation and other information); id. at 3, 7 (housing official, STIU manager, and "everybody that has a log-in to CMIS" can view CMIS file; ECF No. 99-2 at 2 (CMIS screen showing inmate safety concern). On the other hand, the "STIU" information is a more sensitive file, kept in hardcopy form only, that follows an inmate from facility to facility and can take at least a week to reach the receiving facility. See ECF No. 99-1 at 5 (STIU is a "hard copy file" that follows the inmate and can take a week to week-and-a-half to reach the receiving institution); id. 7 (STIU staff and wardens have access to STIU file). This distinction is largely immaterial but is provided for context.

14

Burqueños. ECF No. 97-4 at 6. He is aware that there have been influential Burqueños leaders at Southern. ECF No. 99-1 at 8. Defendant Blanco admits that inmate-on-inmate violence is a serious concern in the prison system. ECF No. 99-1 at 8. He also understands that gang-related violence has led to serious injury or death, and he acknowledges that there have been a few inmate-on-inmate assaults related to the Burqueños gang during his tenure. ECF No. 99-1 at 8.

Part of the job duties of Defendant Blanco and the STIU staff was to review the STIU files of inmates being transferred to SNMCF, in order to make housing recommendations for inmate safety. ECF No. 97, UMF X(i), (iv), (ix) (as modified).[17] Upon receiving transport orders identifying the incoming inmates, STIU staff would initially review the CMIS file for each inmate. *Id.*, UMF X(ii) (as modified). Then, at a later time, STIU staff would review the inmate's entire STIU file, in order to look for security concerns within the CMIS file to follow up on. *See id.*, UMFs X(vii), X(ix). There were no policies or procedures dictating precisely when the STIU files were to be reviewed after receipt. *Id.*, UMF X(v). However, the STIU file for the incoming inmate would arrive at the facility approximately a week after the inmate's transfer. *Id.*, UMF X(iii).

## V.  Plaintiff's Alleged Injuries

Ultimately, Plaintiff's housing assignment to Pod 4B resulted in Plaintiff being housed with inmate Joshua Garcia, a suspected member of the Burqueños gang. ECF

---

[17] Defendant NMCD has objected to several subparts of UMF X(i) on the basis that Defendant Blanco alone is not responsible for reviewing STIU files. *See* ECF No. 123, Response to UMF X(i)–(ii), X(iv), X(vii)–(viii). The record indicates that Defendant Blanco was referring to the practices of STIU generally. *See* ECF No. 97-4 at 3–5; ECF No. 123-2 at . The Court has modified the subparts to UMF X, as necessary, to refer to the practices of STIU generally, rather than Defendant Blanco specifically.

No. 97-1 at 9; ECF No. 98-5 at 1. On August 5, 2019, Plaintiff was on the phone in his pod when he was approached by Garcia. ECF No. 98-5 at 1.[18] Garcia was carrying a cup filled with scalding hot water, which he had retrieved from the microwave, and he threw the substance onto Plaintiff, injuring him. *See* ECF No. 98-5 at 1–4. As a result of being doused with the hot water, Plaintiff suffered first- and second-degree burns to his face, neck, chest, and shoulders. *See id.*; ECF No. 97-23 at 1.[19] He also suffered internal injury to his esophagus. ECF No. 97-11 at 7. Plaintiff was burned so severely that he was unable to eat solid foods, and his weight dropped 40 pounds in about a month. ECF No. 98, UMF VV; ECF No. 97-11 at 7.[20] Plaintiff also experienced long-lasting changes to his skin, including increased sensitivity, changes in skin color, pain in the injured areas, and psychological harm. ECF No. 98, UMF WW; ECF No. 97-11 at 7. He also suffered bruising to his legs from bean bag rounds that were deployed against him by prison guards as a result of the encounter with Garcia. ECF No. 98-5 at 1–2. After the injury, Plaintiff was transported to MountainView Regional Medical Center in Las Cruces, then airlifted to the University of New Mexico Hospital's burn unit in Albuquerque. ECF No. 98, UMFs SS, TT; ECF No. 98-11 at 6.

---

[18] Defendant Turnbow disputes only the portion of Plaintiff's UMF uu regarding whether Garcia is a "known member" of the Burqueños. *See* ECF No. 126 at 13. This dispute is immaterial, given that the parties do not dispute that Garcia was a "suspected" member. *Id.*

[19] Defendant NMCD disputes whether Plaintiff suffered "serious" or "severe" injuries. *See* ECF No. 123, Response to UMF QQ. The record reflects that Plaintiff suffered "first degree" and "second degree burns" (*see, e.g.,* ECF No. 97-23), so the Court will use this terminology instead.

[20] Defendant NMCD disputes Plaintiff's UMF VV, stating that although "Plaintiff may have experienced throat pain from the incident," the problem was not "on-going" and that Plaintiff lost 15 pounds, not 40 pounds. *See* ECF No. 123 at 19–20. This dispute regarding the severity of Plaintiff's injury is immaterial.

Prior to Plaintiff's injury, Garcia's inmate file reflected a history of at least one other gang-related assault on a fellow inmate, as well as a history of violence. *See* ECF No. 97-19 at 3–8. Garcia had also warned Plaintiff before the assault, "Mike [Padilla] don't want you in this unit." ECF No. 97, UMF NN.[21] During an interview after the assault, Garcia would not say anything other than, "It had to be done, it was a long time coming." *Id.*, UMF XX.

## VI. Summary of Plaintiff's Allegations Against NMCD

For purposes of the present Motion, based on the specific facts stated above, the Court assumes that NMCD had the following policies, practices or customs, which affected the conditions of confinement of NMCD inmates including Plaintiff:[22]

> A. Defendant NMCD did not require its personnel to review detailed "inmate safety concerns" in CMIS for every inmate prior to assigning them to a housing unit or when reviewing such assignment. Instead, personnel only reviewed inmate safety concerns if they noticed evidence of an increased risk of harm or if the inmate raised the issue. In practice, personnel sometimes still did not review inmate safety concerns even when there

---

[21] Defendant NMCD disputes Plaintiff's UMF NN, stating that he "disputes that Garcia and Plaintiff were in medical together prior to the attack or that Garcia [issued a warning to Plaintiff]." ECF No. 123 at 18. In support of this dispute of fact, Defendant NMCD states that Plaintiff could have shared this information with a corrections officer but "made no mention of this during his interview after the assault" or "in his Complaint," thus suggesting that Plaintiff's statement is not credible. *Id.* Viewing the evidence in the light most favorable to the nonmovant, the Court assumes that Plaintiff's statement, made under oath during his deposition, is true for summary judgment purposes.

[22] Although the parties claim to dispute several facts relating to the individually named Defendants' actions (*see generally* ECF No. 97, UMFs W–Y; ECF No. 123, Responses to UMFs W–Y), the Court has distilled these allegations regarding individually named Defendants into two key allegations regarding Defendant NMCD's policies, practices or customs. This is consistent with the arguments made by Plaintiff in his briefing on Defendant NMCD's relevant policies, practices or customs. *See* ECF No. 97 at 28–29. The only arguments made by Plaintiff pertain to the two policies, practices or customs listed. The Court has not cited facts that are immaterial to Plaintiff's arguments, unless helpful for background purposes. *See id.*

was evidence of increased risk of harm to an inmate. *See generally* ECF No. 97, UMFs W, Y.

B. After transfer to a new facility, an inmate's STIU file was delayed for approximately one week from the date of transfer, thereby preventing personnel at the new facility from accessing some or all of this information during that time period. *See generally* ECF No. 97, UMF X.

## LEGAL STANDARDS

### I.   Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id.* at 248.[23]

---

[23] Several of the facts presented by the parties are immaterial. The Court acknowledges that some of the facts, although immaterial, are helpful for the purpose of providing background and context of the case. If material, the Court will apply these facts, as necessary, in the Analysis section of this Memorandum Opinion and Order.

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the nonmovant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)) (internal quotation marks omitted).

It is not the Court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). However, summary judgment may nevertheless be granted where "the evidence is merely colorable, or is not significantly probative." *Liberty Lobby, Inc.*, 477 U.S. at 249–50.

## II.    Standard for *Sua Sponte* Dismissal Under Rule 12(b)(6)

The Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although dismissals under

Rule 12(b)(6) generally follow a motion to dismiss, giving plaintiff notice and opportunity to amend [the] complaint, a court may dismiss *sua sponte* when it is "patently obvious" that the plaintiff could not prevail on the facts alleged, and allowing the Plaintiff an opportunity to amend the complaint would be futile. *Hall v. Bellmon*, 935 F.2d 1106, 1109–10 (10th Cir. 1991).[24]

## DISCUSSION

I.  **The Court will dismiss the claims made against Defendant NMCD in Count II of the First Amended Complaint.**[25]

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). However, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Although Plaintiff argues that Defendant NMCD should not be considered an arm of the State of New Mexico, Plaintiff concedes that, "[f]or purposes of this action, the § 1983 claim against NMCD contained in Count II of the [First] Amended Complaint is subject to dismissal." ECF No. 145 at 2–3. Defendant NMCD agrees that

---

[24] As previously noted, the Court provided the parties with notice and an opportunity to brief the issue of whether NMCD is an arm of the State of New Mexico for purposes of 42 U.S.C. § 1983, and if so, whether Plaintiff's § 1983 claims are "subject to dismissal or summary judgment" on that basis. *See* ECF No. 143 at 1–2.

[25] Defendant Estevan Flores was the only other party sued in Count II of the First Amended Complaint. *See* ECF No. 30 at 17. However, all claims against Defendant Flores have been dismissed with prejudice by stipulation of the parties. *See* ECF No. 73. Therefore, this Order is dispositive of all remaining claims brought in Count II of the First Amended Complaint.

dismissal is appropriate. *See* ECF No. 144 at 3.[26] Therefore, in light of the parties' agreement, the Court will dismiss all claims brought against Defendant NMCD in Count II of the First Amended Complaint. Defendant NMCD's Motion is now moot as to Count II.

II.     **Defendant NMCD's immunity has been waived under § 41-4-6 of the NMTCA; therefore, the Court will deny summary judgment on Count IV of the First Amended Complaint.**

A. **Applicable Law**

Under the NMTCA, a New Mexico "governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort," subject to certain specifically enumerated exceptions, or waivers of immunity. *See* N.M. Stat. Ann. § 41-4-4(A) (1978). One waiver of immunity exists for negligence claims against "public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." *See id.*, § 41-4-6. While it may be appropriately termed a "premises liability" statute, the waiver of immunity under § 41-4-6 applies to more than the operation or maintenance of the physical aspects of the building. It also includes safety policies necessary to protect people who use the building, as well as operation and maintenance of machinery, equipment, or furnishings. *See id.*; *Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006) (citing *Castillo v. Santa Fe Cnty.*, 755 P.2d 48, 50 (N.M. 1988); *Leithead v. City of Santa Fe*, 940 P.2d 459, 462–463 (N.M. 1997)); *Bober v. N.M. State Fair*, 808 P.2d 614, 623 (N.M. 1991).

---

[26] Although only Plaintiff and Defendant NMCD have agreed to dismissal of the claims brought in Count II, the Court provided all parties an opportunity to brief this issue prior to dismissal of these claims. *See* ECF No. 143.

The New Mexico Supreme Court and Court of Appeals have explained some of the limits of the waiver of immunity contained in § 41-4-6. For instance, these courts have held that the waiver does not apply to mere negligent supervision, but the waiver can apply to negligent acts of employee supervision that endanger the general public. *Compare Espinoza v. Town of Taos*, 905 P.2d 718, 722 (N.M. 1995) (waiver did not exist where failure to supervise children in a playground did not render the premises unsafe) *with Leithead*, 940 P.2d at 462–463 (waiver existed for injury resulting from creation of dangerous condition to the general public in the operation of a swimming pool without an adequate number of trained lifeguards).

Pertinent to the present case, New Mexico courts have also opined on tort claims involving the operation of New Mexico prisons. For instance, in *Archibeque v. Moya* a prison administrator negligently failed to check a list of names before placing an inmate into an area of the prison with his known enemies. 866 P.2d 344, 347 (N.M. 1993). In that case, the New Mexico Supreme Court held that immunity was not waived when a governmental employee was "performing an administrative function associated with the operation of the corrections system." *Id.* In addition to finding that the express language of § 41-4-6 did not cover administrative functions "affect[ing] a single inmate," the court also noted that the purpose of the NMTCA would be undermined if the state were to be found subject to liability "for virtually any mistake made during the administration of corrections facilities that results in injury to an inmate." *See id.* at 349.

In *Calloway v. New Mexico Department of Corrections*, the New Mexico Court of Appeals distinguished *Archibeque* by recognizing that the waiver of immunity applies to a state prison facility if defendants "knew or should have known that roaming gang

members with a known propensity for violence had access to potential weapons in the recreation area, that such gang members created a dangerous condition on the premises of the penitentiary, and that the danger to other inmates was foreseeable." 875 P.2d 393, 398–399 (N.M. Ct. App. 1994). The distinction drawn between *Archibeque* and *Calloway* was that in *Calloway*, the defendants' actions resulted in a risk of harm to the general prison population, thus creating an unsafe condition on the prison premises. *See id.* at 399. The court in *Calloway* noted that *Archibeque*, on the other hand, did not involve a risk of harm to the general prison population, but rather an administrative decision affecting one inmate. *See id.*

Ultimately, New Mexico courts have recognized that, with respect to whether immunity is waived under § 41-4-6, "the critical question is whether the condition creates a potential risk to the general public." *See Espinoza*, 905 P.2d at 721. "[T]he reference to the 'general public' in *Espinoza* does not mean a condition that must be dangerous to the entire public, but rather, at least potentially, to the particular class of people that use the building or facility in question." *Upton*, 141 P.3d at 1264. "The key point in *Espinoza* is that the negligence must be of a kind which makes the premises dangerous, or potentially so, to the affected public, the consumers of the service or the users of the building, including the plaintiff." *Id.* at 1265.

### B. Analysis

As stated above, in order for Defendant NMCD to be subject to a waiver of immunity as a state governmental entity under § 41-4-6, Plaintiff would need to show that Defendant NMCD's failure to require a review of the "inmate safety concerns" prior to housing assignments resulted in creation of a danger to all inmates or a general class

of inmates, rather than a danger to Plaintiff only. *See, e.g., Archibeque*, 866 P.2d at 347 ("operation" and "maintenance" of penitentiary premises under § 41-4-6 "does not include the security, custody, and classification of inmates"); *see also Kreutzer v. Aldo Leopold High Sch.*, 409 P.3d 930, 943 (N.M. Ct. App. 2017) (absent additional facts such as a pattern of violence in a specific area of the premises, § 41-4-6 does not apply to a single student-on-student altercation occurring on school property); *Lessen v. City of Albuquerque*, 187 P.3d 179, 180–185 (N.M. Ct. App. 2008) (§ 41-4-6 did not apply to city's release of a pretrial detainee "inmate" with heroin withdrawal, given that the alleged risk was "specific to the City's treatment of decedent," rather than the general "population of released inmates").

Although the Court's prior memorandum opinions found that the individually named Defendants were not subject to liability on the basis of the New Mexico Tort Claims Act (*see* ECF Nos. 146, 147), the Court comes to the opposite conclusion with respect to Defendant NMCD. Specifically, the Court finds that there is sufficient evidence for a reasonable jury to conclude that NMCD had a policy, practice, or custom of failing to require its personnel to review detailed "inmate safety concerns" in CMIS for every inmate prior to assigning the inmate to a housing unit or when reviewing such assignment.

With respect to Defendant Turnbow and Defendant Renteria,[27] when viewed in the light most favorable to Plaintiff, NMCD's policy, practice, or custom resulted in

---

[27] Regarding the specific allegations made by Plaintiff regarding Defendant Blanco, the Court is of the opinion that Plaintiff has not set forth sufficient evidence showing that NMCD's policy, practice, or custom of delayed arrival of an inmate's STIU file after transfer from one facility to another resulted in any direct harm to Plaintiff. Although the Court is concerned that this policy could result in harm to a class of persons including Plaintiff in the future, Plaintiff has not sufficiently demonstrated that he was actually

Defendant Turnbow failing to review Plaintiff's detailed safety concerns during the housing assignment process and Defendant Renteria failing to review Plaintiff's detailed safety concerns during the TAP Committee process, despite sufficient evidence that Defendant NMCD knew or should have known that a class of persons such as Plaintiff would be put at risk of serious harm due to information listed in their documented safety concerns. Further, the evidence shows that Plaintiff was injured by Defendant NMCD's policy, practice or custom: Plaintiff was almost immediately attacked by a member of the Burqueños gang, because of the same information contained in Plaintiff's documented safety concerns. Finally, Plaintiff has made a sufficient showing that the harm he suffered was more than his own "security, custody, or classification," *see Archibeque*, 866 P.2d at 347, and that a class of inmates (including those with documented safety concerns) was put at risk due to Defendant NMCD's policy, practice, or custom of failing to require its staff to review an inmate's detailed safety concerns. *Compare id. (Archibeque)* at 347 (no liability where a single inmate is put at risk by an administrative decision) *with Calloway*, 875 P.2d at 398 (liability possible where a segment of the population is put at risk due to a dangerous condition on the premises).[28]

---

harmed by this policy, practice, or custom. For instance, Plaintiff has not shown how a delay of one week impacted his safety at all, given that he was in orientation (and thus in isolation) during most or all of this time. This issue does not affect the outcome of the present Motion, given that the Court has denied the motion on other grounds. Further, the parties are not prejudiced from presenting evidence of (or raising evidentiary concerns regarding) this policy, practice or custom by this Order.

[28] Based on the evidence presented, it is possible that a reasonable jury could find any of the following: (1) Defendant Turnbow looked at both Plaintiff's CBC Summary Review Report and detailed safety concerns (in which case he was deliberately indifferent to a substantial risk to Plaintiff's safety for Eighth Amendment purposes); (2) Defendant Turnbow looked only at Plaintiff's CBC Summary Review Report but, pursuant to NMCD policy, practice or custom, did not view his detailed safety concerns (in which case NMCD's policy, practice or custom presented an unreasonable risk of harm to the inmate population for NMTCA purposes); or (3) none of these occurred and that Defendant Turnbow did not violate Plaintiff's rights under Section 1983 or the NMTCA. For purposes of the present motion, viewing

It is also important to note that, when viewed in the light most favorable to Plaintiff, NMCD's failures were not limited to one single administrative decision but were made up of "behavior that goes beyond these limits," given that multiple employees were acting pursuant to NMCD's policy, practice, or custom, and there was a potential risk to anyone put in Plaintiff's position, not just Plaintiff. *See Upton*, 141 P.3d at 1264–65 (alleged systemic failures in handling school health emergency resulted in a dangerous condition to any student needing proper emergency response). In Plaintiff's case, a reasonable jury could find that NMCD's policy, practice, or custom of not requiring those with authority over housing assignments to review detailed safety concerns resulted in the injuries Plaintiff suffered. This case meets the standards set forth in *Calloway* and *Upton*, and it is distinguishable from *Archibeque*, based on evidence of a policy, practice, or custom that exceeded a single administrative decision and involved multiple employees of NMCD, including (but not limited to) Defendants Renteria and Turnbow.

In light of the facts and the law stated above, the Court finds that Plaintiff has asserted an applicable waiver of governmental immunity for tort claims under the NMTCA, and therefore the Court must deny summary judgment to Defendant NMCD.

## CONCLUSION

For the foregoing reasons, Defendant New Mexico Corrections Department's Motion for Summary Judgment, filed on August 2, 2021, ECF No. 81, is hereby **FOUND AS MOOT IN PART** and **DENIED IN PART**.

---

the facts in the light most favorable to the Plaintiff, the Court finds that the facts support a negligence theory under option (2) above, even if other possibilities exist. *See* Factual Background § II, *supra*.

Based on the parties' agreement, the Court hereby dismisses the claims brought against Defendant New Mexico Corrections Department in Count II of the First Amended Complaint, ECF No. 30. Therefore, Defendant NMCD's request for summary judgment on Count II is moot. In all other respects, the Motion is denied.

**IT IS SO ORDERED.**

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE